UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

JANE DOE (A.E.W.), *an individual*,

    Plaintiff,

    v.

CHOICE HOTELS INTERNATIONAL,
INC.,
CHOICE HOTELS INTERNATIONAL
SERVICES CORP. and
TINICUM LODGING, INC.
*d/b/a Quality Inn Philadelphia Airport*,

    Defendants.

Civil Action No. 24-3769-TDC

MEMORANDUM OPINION

Plaintiff Jane Doe has filed this civil action against Defendants Choice Hotels International,

Inc. and Choice Hotels International Services Corp. (collectively, "Choice"), as well as Defendant

Tinicum Lodging, Inc. ("Tinicum"), in which she asserts claims under the Trafficking Victims

Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1581–1597, based on her allegation that

she was a victim of sex trafficking by an unidentified individual at a hotel in Lester, Pennsylvania

owned and operated by Tinicum and subject to a franchise agreement with Choice. Choice has

filed a Motion to Transfer Venue or, in the Alternative, to Dismiss, and Tinicum has filed a Motion

to Dismiss based on a lack of personal jurisdiction, improper venue, and a failure to state a claim.

Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md.

Local R. 105.6. For the reasons set forth below, Choice's Motion will be GRANTED, and

Tinicum's Motion will be GRANTED IN PART and DENIED IN PART, in that the Court finds a

lack of personal jurisdiction over Tinicum but will transfer the claims against it, and the entire case, to the United States District Court for the Eastern District of Pennsylvania.

## BACKGROUND

### I.   Trafficking Allegations

In the presently operative Amended Complaint, Doe, a resident and citizen of Delaware, alleges that she was the victim of sex trafficking at the direction of an unidentified trafficker. Specifically, Doe alleges that she was "trafficked through force, fraud and coercion by her trafficker and required to engage in numerous commercial sex acts for his financial benefit," and that she was trafficked at "various times between November 2014 and December 2014" in rooms at the Quality Inn Philadelphia Airport located in Lester, Pennsylvania ("the Quality Inn"). Am. Compl. ¶ 26, ECF No. 5. During 2014, the Quality Inn was owned and operated by Tinicum, a Pennsylvania corporation with its principal place of business in Lester, Pennsylvania, as a franchise of Quality Inn, a hotel brand of Choice, a Delaware corporation and hotel franchisor with its headquarters in Rockville, Maryland.

In this litigation, Doe brings claims under the TVPRA against Choice and Tinicum, a Choice franchisee, both of which Doe alleges "owned, operated, and controlled" the Quality Inn. *Id.* ¶¶ 15–16. Doe alleges that Defendants had "actual and constructive knowledge" of her trafficking at the Quality Inn. *Id.* ¶ 75. In support of this allegation, Doe presents facts about the "widely known and pervasive" nature of hotel sex trafficking generally as well as the "ongoing and widespread" nature of sex trafficking at Choice-branded hotels specifically. *Id.* ¶¶ 31, 47. As to the nature of hotel sex trafficking generally, Doe alleges that "sex slavery is pervasive in the United States, and hotels are the primary place where it happens," citing statistics such as that, in 2014, "92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking

taking place at hotels," and asserting that, given this link, "government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking." *Id.* ¶¶ 32–33. According to Doe, this "relationship between sex trafficking and the hotel industry necessarily shapes what [Defendants] knew or should have known regarding the trafficking at their hotel properties." *Id.* ¶ 31.

As to the nature of sex trafficking at Choice-branded hotels specifically, Doe asserts that Choice's "actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry." *Id.* ¶ 47. As to Choice, Doe alleges that it "monitored criminal activity occurring at Choice hotels branded properties and [was] aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the Subject Quality Inn." *Id.* ¶ 48. In support of this allegation, Doe primarily points to numerous online reviews left by customers of various Choice-branded hotels between 2012 and 2018 referencing the presence of prostitution and other illicit activities.

With respect to both Choice and Tinicum, Doe alleges that they were "specifically aware that sex trafficking was widespread and ongoing at the Subject Quality Inn." *Id.* ¶ 58. In support of this allegation, Doe asserts that the Quality Inn experienced "the presence of criminal activity associated with sex trafficking" and identifies five online reviews, all published after the time period during which Doe was trafficked, referencing the presence of prostitution and other illicit activities at the Quality Inn. *Id.* ¶ 60. First, a TripAdvisor review from August 2016 stated:

> DO NOT WASTE YOUR MONEY!!! Worst hotel stay EVER. Changed from one filthy room to another. Smelly and filthy! Obvious prostitution happening in parking lot.

*Id.* A TripAdvisor review from May 2016 stated:

3

... the hookers & drug dealers were coming and going all night long. shouting obscenities, slamming doors and playing very loud rap music with thumping bass ...

*Id.* A Yelp review from May 2017 stated:

WARNING: DO NOT STAY HERE! This was the most vile place I've ever stepped foot in .... I assume this Quality Inn is for prostitutes and their tricks because I don't know who else in their right mind would ever stay here. STAY AWAY.

*Id.* An Expedia review from May 2018 stated:

had to leave the hotel as it was under construction and the room had a USED CONDOM in it!!!!!!!!!!!!!!!!!

*Id.* Finally, a TripAdvisor review from June 2018 stated:

When I asked about an elevator or someway to get my bags to my room I was told, I could carry them myself or maybe pay someone like a cab driver. I guess I could have paid one of the prostitutes in the parking lot, but they didn't really look strong enough to carry my bag ...

*Id.*

Further, Doe alleges that Tinicum "knew or was willfully blind to the fact" of her sex trafficking at the Quality Inn because "there were obvious signs that her traffickers were engaged in sex trafficking" observed by Quality Inn managers and employees. *Id.* ¶¶ 71, 73. These signs included that the "hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards," "[h]otel management and/or employees would allow [Doe] to make other arrangements to secure a room if she could not pay with cash," "[h]otel management and/or employees charged [Doe] extra for the rooms she rented as a result of the activity occurring," "[o]ther girls were trafficked at the same hotel at the same time," "[h]otel management and/or staff solicited services from" Doe, there was "heavy foot traffic in and out of [Doe's] room involving men who were not hotel guests," and Doe "was forced to see at least 5 johns every day" who "entered and left at unusual hours and were present at the hotel for brief periods of time." *Id.* ¶ 71.

4

Doe alleges that despite its knowledge of the sex trafficking involving Doe, Tinicum facilitated it by continuing to "rent[] rooms to these traffickers, including the rooms used to sexually exploit victims," thereby "providing them a venue in the form of hotel rooms and related services." *Id.* ¶¶ 77–78.

Doe further alleges that Tinicum facilitated her trafficking by (1) "allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking"; (2) "inadequate and inadequately enforced sex trafficking notice[s] and training for hotel staff"; (3) "choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures"; and (4) "implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff." *Id.* ¶ 79.

As for Choice, Doe alleges that Choice "knew or should have known" about the sex trafficking of Doe based on a policy that "required hotel staff to report suspected criminal activity including sex trafficking." *Id.* ¶ 74. Doe further asserts that Choice facilitated the trafficking of Doe by retaining "control" over responses to sex trafficking at Choice-branded hotels, including the design, implementation, and enforcement of policies and practices to prevent or respond to trafficking, whether and how additional training was needed and provided, when information would be shared with law enforcement about suspected trafficking, and whether to terminate a franchise agreement or hotel staff because of trafficking. *Id.* ¶ 80b. Choice also allegedly maintained a security team to investigate potential criminal incidents, including sex trafficking, as well as a hotline for franchisees and hotel staff to report suspected trafficking. Doe further alleges

5

that Choice has such knowledge based on her claims that Choice maintained control over general policies and practices at Choice-branded hotels such as the Quality Inn, including those relating to processes for room reservations and rates, check-in, and payment; the provision of internet services; housekeeping services; and discount and reward programs, and because Choice allegedly maintained a "do not rent" system and maintained and analyzed data on hotel guests and housekeeping services. *Id.* ¶ 81.

Finally, Doe alleges that by engaging in these practices, Choice and Tinicum participated in two distinct ventures with links to sex trafficking generally, and to her sex trafficking specifically, from which Choice and Tinicum benefited financially. First, Doe alleges that Choice and Tinicum "knowingly benefited from engaging in a venture with sex traffickers at the Subject Quality Inn" through which sex traffickers engaged in violations of the TVPRA by trafficking victims, including Doe, at the Quality Inn. *Id.* ¶¶ 93, 93b. In turn, Choice and Tinicum benefited from this trafficking, which they "knew or should have known about," by receiving payments as a result of the sex traffickers' room rentals. *Id.* ¶¶ 93a, 93b. Doe further alleges that this venture involved "a mutually beneficial relationship" between Defendants and the sex traffickers, who "frequently used the Subject Quality Inn for their trafficking because of an implicit understanding" that there would be "minimal interference" and a "lower[ed] . . . risk of detection." *Id.* ¶¶ 93d, 93e.

Second, Doe alleges that Choice "also knowingly benefited from engaging in a commercial venture with" Tinicum in "operating the Subject Quality Inn" in a way that facilitated sex trafficking "by keeping operating costs low, maintaining the loyalty" of sex traffickers, and "not acknowledging the pervasive nature of sex trafficking" at Choice-branded hotels generally and at the Quality Inn specifically. *Id.* ¶¶ 94, 94c. According to Doe, Choice benefited from this venture

by receiving revenue from rooms rented to traffickers pursuant to the revenue sharing arrangement in the franchise agreement despite having "actual or constructive knowledge" of the sex-trafficking at Quality Inn. *Id.* ¶¶ 94b, 94e.

## II.    The Complaint

On December 30, 2024, Doe filed the original Complaint in this case. On January 14, 2025, Doe filed the presently operative three-count Amended Complaint. In Count 1, Doe asserts a claim against Tinicum for "perpetrator liability" under the TVPRA based on the allegation that Tinicum "harbored individuals (including [Doe]) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts" while at the Quality Inn, and "knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in" such violations, in violation of 18 U.S.C. §§ 1591(a)(1), 1591(a)(2), and § 1595. *Id.* ¶ 103. In Count 2, Doe asserts a claim against both Choice and Tinicum for "beneficiary liability" under 18 U.S.C. § 1595(a), in that they "received a financial benefit from participating in a venture with traffickers, including [Doe's] traffickers, despite the fact that each defendant knew or should have known that these traffickers . . . were engaged in violations of" the TVPRA, and that Choice "received a financial benefit from participating in a venture with its respective Franchisee regarding the operations of its respective hotel properties even though" Choice "knew or should have known that this venture was violating" the TVPRA, in violation of 18 U.S.C §§ 1591(a) and 1595(a). *Id.* ¶¶ 106–07. In Count 3, Doe asserts a claim against Choice for vicarious liability for Tinicum's TVPRA violations in Counts 1 and 2.

## DISCUSSION

In its Motion, Tinicum seeks dismissal for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), improper venue pursuant to Rule 12(b)(3), and failure to state a claim pursuant to Rule 12(b)(6). Choice separately seeks transfer of this case to the United States District Court for the Eastern District of Pennsylvania based on improper venue pursuant to Rule 12(b)(3) or, in the alternative, pursuant to 28 U.S.C. § 1404. Choice also seeks dismissal of the claims against it for failure to state a claim pursuant to Rule 12(b)(6).

## I.      Personal Jurisdiction

The Court first addresses the argument by Tinicum, a corporation established under the laws of Pennsylvania with its principal place of business in Pennsylvania, that the claims against Tinicum should be dismissed for lack of personal jurisdiction because the Court lacks either general or specific jurisdiction over it.

### A.      Legal Standards

It is the plaintiff's burden to establish personal jurisdiction. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993). To carry that burden at the pleading stage, the plaintiff need only make a *prima facie* showing that a defendant is properly subject to this Court's jurisdiction. *Id.* In evaluating the plaintiff's showing, this Court must accept the plaintiff's allegations as true, and it must draw all reasonable inferences and resolve any factual conflicts in the plaintiff's favor. *Id.* The Court may consider evidence outside the pleadings in resolving a Rule 12(b)(2) motion. *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 763-64 (D. Md. 2009).

A district court's exercise of personal jurisdiction over a non-resident defendant must satisfy both the long-arm statute of the state in which the court sits and the Due Process Clause of

8

the Fourteenth Amendment to the United States Constitution. *Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). However, where the Court concludes that, as discussed below, Doe has failed to demonstrate that this Court can exercise personal jurisdiction over Tinicum pursuant to the Due Process Clause, it need not and will not analyze whether it can exercise personal jurisdiction over Tinicum under the long-arm statute.

Under the Due Process Clause of the Fourteenth Amendment, personal jurisdiction may be exercised over a party upon a showing that the party has sufficient "minimum contacts" with the forum state such that "maintenance of the suit [in the state] does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In assessing the presence of minimum contacts, courts distinguish between two types of personal jurisdiction: general and specific. Where it is undisputed that Tinicum is not a citizen of Maryland, Tinicum argues, and Doe does not dispute, that this Court lacks general jurisdiction over it. Accordingly, the Court's analysis will be limited to whether there is specific jurisdiction over Tinicum.

Specific, or case-linked, jurisdiction provides authority "over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). For a court to exercise specific jurisdiction over a defendant, the defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum State," and its "conduct and connection with the forum State" must be "such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The Court determines if it has specific jurisdiction over an entity by considering "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of

9

those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)). The Court will examine each element in turn.

### B.    "Purposefully Availed"

The United States Court of Appeals for the Fourth Circuit has stated that the purposeful availment inquiry "is not susceptible to a mechanical application" and has identified a list of non-exclusive factors to be considered in the analysis:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) (quoting *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198-99 (4th Cir. 2018)). In assessing this element, courts consider "the *quality* and *nature* of the defendant's connections" to the forum state, "not merely the number of contacts between the defendant and the forum state." *Id.* In determining whether out-of-state defendants purposefully availed themselves of the privilege of doing business in the forum state, a court is "entitled to accord special weight to the fact that" the out-of-state defendant initiated contact with the plaintiff in the forum state. *CFA Inst. v. Fin. Analysts of India*, 551 F.3d 285, 295 n.17 (4th Cir. 2009).

In its Motion, Tinicum generally asserts that it "did not purposefully avail itself of the privilege of conducting activities in the state of Maryland" because it "conducts no business in Maryland." Tinicum Mot. at 10, ECF No. 29-1. In response, Doe argues that, "when a non-

resident franchisee has an ongoing course of business with a franchisor whose principal place of business is in the forum state, the franchisee has minimum contacts with the forum state." Opp'n to Tinicum Mot. at 17, ECF No. 32. Specifically, Doe argues that Tinicum has purposefully availed itself of the privilege of conducting activities in the state of Maryland by virtue of the facts that Tinicum entered into a franchise agreement with Choice, a Maryland-based corporation, and that the agreement was signed in Maryland.

Here, the Court concludes that Tinicum has purposefully availed itself of the privilege of conducting activities in the state of Maryland. Notably, the United States Supreme Court has found such purposeful availment in the forum state by a non-citizen franchisee which entered into a franchise agreement with a franchisor based in the forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479–80 (1985) (holding that a Michigan franchisee had purposefully availed itself of the privilege of doing business in Florida where it had "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise" and thus received "the manifold benefits that would derive from affiliation with a nationwide organization" and voluntarily accepted "the long-term and exacting regulation of his business from Burger King's Miami headquarters"); *see also Econo Lodges Int'l, Inc. v. Peck* ("*Econo Lodges*"), No. 93-1519, 1993 WL 369262, at *2 (4th Cir. Sept. 22, 1993) (unpublished) (holding that a Florida hotel franchisee had purposefully availed itself of the privilege of doing business in North Carolina by entering into a franchise agreement with a franchisor, Econo Lodges International, Inc., whose principal place of business was in North Carolina). Where Tinicum entered into a franchise agreement with Choice, a Maryland-based franchisor, the Court finds pursuant to *Burger King* that the purposeful availment prong is satisfied. *See Burger King Corp.*, 471 U.S. at 479–80.

C. **"Arise Out of or Relate to the Defendant's Contacts"**

The second due process requirement is that the plaintiff's claims must "arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255, 262 (2017)); *see Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 139 (4th Cir. 2020) (concluding that Marriott's significant activities relating to multiple hotels in South Carolina were not sufficient to establish personal jurisdiction there when those activities had "nothing to do with the claims asserted by the Plaintiffs" of negligence arising from injuries sustained at a Marriott-affiliated hotel in Italy). This standard does not mean "that only a strict causal relationship between the defendant's in-state activity and the litigation will do," as "some relationships will support jurisdiction without a causal showing." *Ford Motor Co.*, 141 S. Ct. at 1026. Still, the standard "does not mean anything goes." *Id.* "In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

As an initial matter, Doe relies heavily, if not exclusively, upon Tinicum's franchise agreement with Choice as the key contact to establish relatedness. Doe's claims against Tinicum, however, do not directly arise from the franchise agreement in that Doe does not allege a breach of that agreement. This case is thus distinguishable from *Burger King* and *Econo Lodges*, in which specific jurisdiction was established over a franchisee in the franchisor's home state when the claims centered on breaches of the franchise agreements themselves. *See Burger King Corp.*, 471 U.S. at 468–69, 480; *Econo Lodges*, 1993 WL 369262, at *1–2; *see also Madden v. Petland Summerville, LLC*, No. 20-CV-02953-DCN, 2021 WL 288370, at *4 (D.S.C. Jan. 28, 2021) (rejecting the argument that the "single act of entering a long-term franchise agreement . . . is sufficient to establish specific personal jurisdiction" and collecting cases). Notably, the franchise

12

agreement does not reference any policies or procedures relating to combating sex trafficking or mention sex trafficking in any way.

Perhaps recognizing this issue, Doe does not directly rely on the agreement itself but instead argues that her claims relate to certain contacts arising out of the franchise agreement. Doe broadly argues that the TVPRA claims relate to Tinicum's Maryland contacts because Tinicum's rental of rooms to the traffickers and operation of the Quality Inn in a way that facilitated trafficking related to the statutory element of a "venture" among Choice, Tinicum, and the sex traffickers. Opp'n to Tinicum Mot. at 20–21. Doe also references Tinicum's routine interactions with Choice as part of the franchise arrangement, including Choice's establishment of national policies and procedures relating to hotel operations and the use of Choice's Maryland-based national reservation and payment systems, as related to the business "venture" between Tinicum and Choice alleged in the Amended Complaint to be part of the TVPRA violations. *Id.* Finally, Doe asserts that Tinicum's Maryland contacts relate to the TVPRA requirement of having "knowingly benefited" from sex trafficking because "the traffickers' payments for rooms were processed through Maryland systems," "Choice, acting from Maryland, accepted payments for some rooms," and Tinicum sent revenue generated from the traffickers to Maryland at a rate set by the franchise agreement. *Id.* at 20.

The Court finds that these alleged contacts are not sufficient to show that Doe's claims against Tinicum "arise out of or relate to" its contacts with Maryland. *Ford Motor Co.*, 141 S. Ct. at 1026. First, to the extent that Doe relies on actions undertaken by Choice, such as setting national policies and establishing the percentage of revenue required to be paid to Choice, whether pursuant to the franchise agreement or not, Choice's own actions in Maryland cannot support a finding of personal jurisdiction over Tinicum because such jurisdiction must be established on the

13

basis of each defendant's own contacts with a forum. *See Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773, 1783 (2017).

Second, several of these identified factors, such as Tinicum's renting of rooms to traffickers, the operation of the Quality Inn in a manner that facilitated trafficking, and the alleged following of Choice's national policies, all occurred in Pennsylvania and do not constitute contacts with Maryland. To the extent that Doe appears to argue that these actions are linked to a sex trafficking venture by a Choice policy relating to trafficking, the franchise agreement never mentions sex trafficking at any point and thus does not establish or even reference any policies or procedures relating to detecting, addressing, or reporting sex trafficking.

Third, as to the allegations relating to payments sent to Maryland, neither the Amended Complaint nor any additional information submitted in relation to the Motion provides any facts about any actual payments from traffickers being sent to or processed in Maryland. Rather, the franchise agreement contradicts these claims in that it did not require remittance to Maryland of room revenues from specific transactions, and the Amended Complaint actually alleges that the traffickers often paid in cash. Thus, the only payments sent by Tinicum to Maryland were the standard monthly payments of fees consisting of a single-digit percentage of gross room revenues for the month. Franchise Agreement ¶ 4, ECF No. 39. Necessarily, Tinicum's alleged benefit from the sex trafficking was not included in any of the franchise fee payments sent to Maryland.

The general payment of monthly franchise fees, as well as other general contacts such as Tinicum's use of Choice's national reservation system, consist of a franchisee's routine interactions with a franchisor as part of the operation of a franchise hotel. The Court will not find that such standard contacts between a franchisor and franchisee are sufficient to satisfy the relatedness prong. Even when there is some arguable or general relationship between a claim and

14

a franchisee's agreement or business relationship with its franchisor, courts within the Fourth Circuit have rejected claims of personal jurisdiction in the absence of a specific connection between the plaintiff's claim and the defendant's forum state contacts. For example, in *Sant v. Marriott International, Inc.*, No. 22-1036-GJH, 2023 WL 2213926 (D. Md. Feb. 24, 2023), in which the plaintiff asserted a negligence claim arising out of a slip-and-fall at an India-based franchisee's Marriott hotel in India, the court held that it did not have personal jurisdiction over the franchisee in Maryland, where Marriott is based, because the claim did not arise out of the franchise agreement, even though that agreement generally allowed Marriott to exercise control over all aspects of the hotel. *Id.* at *1, *6–7.

In *Madden*, the court held that it lacked personal jurisdiction over an out-of-state franchisor for a negligence claim arising from a purchase from an in-state pet store franchisee of dogs that later developed unanticipated illnesses because the franchisee's alleged sale of unhealthy puppies was "far removed from [the franchisor's] franchise agreement," even though that agreement required the franchisees to purchase puppies from "breeders that meet certain minimum criteria," which the court deemed "typical of a franchisor-franchisee relationship." *Madden*, 2021 WL 288370, at *1, *5 & n.1. Relatedly, in *Ochua v. Cinthia's Bakery*, LLC, No. 19-03248-JMC, 2020 WL 374462 (D. Md. Jan. 23, 2020), the court concluded that the plaintiff, a delivery worker who asserted a negligence claim against a Virginia restaurant arising from an injury incurred while delivering supplies to the restaurant on behalf of his Maryland-based employer, had not established that there was personal jurisdiction in Maryland over the restaurant because even though his delivery visit was the result of the business relationship between the restaurant and the Maryland supplier, the plaintiff's tort claim was "entirely unrelated to any contractual relationship between" the restaurant and his employer. *Id.* at *1, *4. As these cases illustrate, the existence of some

arguable nexus between a claim and a defendant's business relationship with a franchisor or some other in-state business is not sufficient to show that the claim arises out of or is related to that business relationship.

The lack of sufficient relatedness in the present case is more specifically illustrated upon consideration of *Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085 (Cal. 1996), cited by Doe. In *Vons*, the California Supreme Court considered "whether California courts may exercise personal jurisdiction over owners of 'fast food' restaurant franchises located in another state" in a case in which Vons, a California-based meat supplier, filed civil claims in a California court against Foodmaker, Inc., a California-based franchisor of Jack-in-the-Box restaurants to which Vons had sold meat, and several Jack-in-the-Box franchisees located in Washington state arising from incidents of bacterial contamination of hamburgers made with that meat at their restaurants. *Id.* at 1089. The court found personal jurisdiction in California over the Washington franchisees because (1) their franchise agreements with Foodmaker, which were negotiated and signed in California, included requirements governing which meat suppliers they could use, pursuant to which the franchisees purchased all of their hamburger patties from Foodmaker and sent payments for the meat to California; and (2) the franchise agreements established "uniform standards" for the cooking of the meat, which were allegedly "a source of injury" to the plaintiff, who claimed that the standards "were systematically deficient when measured by industry standards." *Id.* at 1089–90, 1099–1100 (citation omitted). Because the franchisees effectively bought the contaminated meat from the franchisor pursuant to the franchise agreements, and the claim that they undercooked the meat directly implicated the franchise agreements' standards for cooking of meat, the court found that the plaintiff's claims "arose out of" the franchise agreement, which was substantially connected to California. *Id.* at 1100.

16

By focusing on specific links between the plaintiff's claims and certain provisions of the franchise agreements, *Vons* highlights the deficiencies in Doe's personal jurisdiction argument. It was not enough that the franchisees engaged in regular business interactions with their California franchisor, which presumably would have included sending franchise fees derived from food sales to California or using marketing materials provided from California by the franchisor. Notably, while the finding of personal jurisdiction in *Vons* was dependent on the fact that the plaintiffs' claims directly related to the meat purchased from the California franchisor and cooked pursuant to standards set in the franchise agreement signed in California, here, Doe has identified no such connection. Although Doe's claim alleges that Tinicum is liable for sex trafficking at the Quality Inn, there is no part of the franchise agreement that addresses sex trafficking in any way, and there was no comparable product associated with sex trafficking that was the subject of specific purchase and use requirements set forth in the franchise agreement.

In another case cited by Doe, a federal district court, citing *Vons*, concluded that the plaintiffs' claims against California franchisee defendants that their high pressure tactics in selling DirectBuy memberships at in-person sales presentations violated state consumer protection laws were related to their contacts with their Indiana franchisor DirectBuy because the tactics used, including the use of a video prepared by DirectBuy and a policy that attendees who leave a sales presentation without purchasing a membership cannot join DirectBuy for seven years, were "in conformity" with the franchisor's comprehensive system developed in Indiana. *See Ganezer v. DirectBuy, Inc.*, No. 08-8666-GAF, 2012 WL 12867971, at *1, *4 (C.D. Cal. Jan. 30, 2012). Again, the plaintiffs' claims were related to the franchise agreement and the contacts with the franchisor in its home state because the acts in question—selling DirectBuy memberships—were conducted pursuant to policies and procedures established by the franchisor. Here, the sex

trafficking at the Quality Inn, or even the conduct of failing to stop it, was not undertaken by Tinicum pursuant to or in a manner consistent with any part of the franchise agreement or any policy adopted in furtherance of that agreement. Rather, Tinicum's alleged liability for sex trafficking is based on its own conduct at its hotel in Pennsylvania.

The reference to allegations that Tinicum and Choice were engaged in a "venture," as required by the TVPRA, does not change the analysis. Where there is nothing in the franchise agreement that directly or indirectly references a venture involving sex trafficking, and there are no allegations of contacts by Tinicum with Maryland in furtherance of any such venture that are specific to sex trafficking or go beyond generic business interactions, the Court does not find that this allegation transforms Doe's claims against Tinicum into claims sufficiently related to its contacts with Maryland to support personal jurisdiction. Notably, in *Tire Engineering & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303 (4th Cir. 2012), in which an American tire producer alleged that two foreign companies engaged in a conspiracy with its former employee to infringe on its copyrights and steal its tire designs, the Fourth Circuit found personal jurisdiction in Virginia over the defendants where a representative of one of the companies met with the plaintiff's former employee in Virginia to discuss the scheme and the other defendant engaged in repeated later communications with that employee relating to the scheme. *Id.* The court found that the claims arose out of those contacts based on the principle that this standard is met when "substantial correspondence and collaboration between the parties, one of which is based in the forum state, form[ed] an important part of the claim." *Id.* at 303, 306. Although specific correspondence into the forum state about a conspiracy or venture is not necessarily required to establish that such a claim arose from contacts with that state, here, there

are no allegations of any correspondence or other communications between Tinicum and Choice while in Maryland that in any way relate to sex trafficking.

Finally, Doe's citation to *Doe v. G6 Hospitality, LLC*, No. 23-0198-MJT (E.D. Tex. filed Nov. 3, 2023), and similar cases before the same judge, which appear to constitute the only instances in which a court evaluating TVPRA claims similar to those asserted here has concluded that personal jurisdiction exists over a non-resident hotel franchisee in the franchisor's forum state, does not alter this conclusion. *Cf. J.N.K. v. Red Roof Inns*, No. 24-0389-ALM, 2025 WL 772150, at \*7 (S.D. Ohio Mar. 11, 2025) (in addressing a motion to transfer venue, generally stating, without explanation, that a trafficking victim's claims against a hotel franchisee "arose out of" the franchisee's contacts with the franchisor's home state). In *G6 Hospitality, LLC*, the court found that personal jurisdiction existed in Texas, in which the franchisor was based, over a Motel 6 franchisee which allegedly permitted sex trafficking at its hotel in Georgia based on the facts that: (1) rental payments by the plaintiff's traffickers were processed through the franchisor's system in Texas; (2) the franchisee's "cut" of the payments was "determined by the Texas-law governed franchising agreement"; and (3) the franchisee allegedly engaged in a "venture" by knowingly allowing traffickers to rent rooms and creating a "favorable environment for trafficking," which was "allegedly in tension" with the franchisor's policies "regarding criminal activity and human trafficking." *G6 Hospitality, LLC*, No. 23-0198-MJT, slip op. at 16–17 (E.D. Tex. Sept. 30, 2024) (Dkt. No. 68).

Here, however, as discussed above, the facts differ in that the claim that traffickers' payments were processed in Maryland is contradicted by the franchise agreement, and Tinicum's franchise agreement does not address sex trafficking in any way. Further, the Court does not agree that when a franchisee acts in relation to its own hotel not in accordance with a franchise agreement

or franchisor's policy, but contrary to such a policy or in the absence of a policy that could have been established by the franchisor, claims based on the franchisee's conduct must be deemed to arise from or relate to the franchise agreement or policy. In particular, it does not agree that a franchisee's alleged participation in criminal activity at its hotel is related to a franchise agreement simply because the agreement includes a general policy against criminal activity or, as discussed above, that a franchisee's regular monthly franchise fee payments to the franchisor are sufficient to support a finding that a plaintiff's claims arise from or are related to contacts with the franchisor's home state. Such conclusions underlying Doe's theory of personal jurisdiction would sweep too far in that they would effectively establish personal jurisdiction in the franchisor's home forum over any claim against a franchisee that alleges illegal conduct at a franchisee's hotel, or that relates in some way to a paying hotel guest at a franchisee's hotel. That has never been the law and would expand personal jurisdiction over franchisees in the franchisor's home state markedly beyond present limits. Indeed, another judge in this District recently determined that, on substantially similar facts, there was no personal jurisdiction over a non-resident hotel franchisee in the district in which its hotel franchisor is based. *See, e.g.*, *Doe (J.L.K.) v. Choice Hotels Int'l, Inc.*, No. 24-3774-GLR, 2025 WL 2197035, at \*4 (D. Md. Aug. 1, 2025) (concluding that the plaintiff failed to demonstrate that her TVPRA claims arose out of or related to the non-resident hotel franchisee's contacts with Maryland, even where the hotel franchisor was located in Maryland).

In summary, the Court concludes that Doe has failed to demonstrate that her claims against Tinicum arise out of or relate to Tinicum's contacts with Maryland and thus finds a lack of personal jurisdiction over Tinicum on these claims. The Court therefore need not and will not address the

third prong of the personal jurisdiction inquiry. *See Consulting Eng'rs Corp.*, 561 F.3d at 279 ("If the plaintiff satisfies prongs one and two, prong three comes into play.").

Although Doe alternatively requests jurisdictional discovery relating to personal jurisdiction, the franchise agreement has already been produced to Doe and does not reveal a basis for personal jurisdiction, and Doe has not articulated any basis to conclude that there are additional materials that would reveal new contacts relating to sex trafficking that would alter the Court's conclusion. Accordingly, the Court will not grant the request for jurisdictional discovery. *See Carefirst of Md., Inc.*, 334 F.3d at 402 (stating that a court may deny jurisdictional discovery when "a plaintiff offers only speculation or conclusory assertions about contacts with a forum state").

Given the Court's conclusion that there is no personal jurisdiction over Tinicum, the Court need not address the remaining arguments in Tinicum's Motion.

## II.    Transfer of Venue

In its Motion, Choice seeks transfer of this case to the United States District Court for the Eastern District of Pennsylvania based on improper venue under 28 U.S.C. § 1406 or for the convenience of the parties under 28 U.S.C. § 1404, or dismissal for failure to state a claim. In light of the Court's finding that it lacks personal jurisdiction over Tinicum, the Court notes that Doe cannot establish that the District of Maryland is a proper venue under 28 U.S.C. § 1391(b)(1) because that provision authorizes venue in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located," *id.*, and a defendant that is an entity is deemed to reside only "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question," 28 U.S.C. § 1391(c)(2). Where Tinicum is not subject to this Court's personal jurisdiction and thus does not reside in this District, venue is not proper pursuant to 28 U.S.C. § 1391(b)(1).

As for whether venue is proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in the District of Maryland, the Court notes that the primary events underlying the sex trafficking claims occurred in the Eastern District of Pennsylvania, as the actual trafficking occurred at the Quality Inn in Lester, Pennsylvania, and Tinicum's alleged failure to prevent such trafficking also occurred at the hotel. Although it does not appear that "a substantial part of the events or omissions" underlying the claim occurred in Maryland, the Court need not decide that question because, as discussed below, it finds that transfer to the Eastern District of Pennsylvania is warranted under 28 U.S.C. § 1404.

Under that provision, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). Ordinarily, to prevail on a motion under § 1404(a), the moving party "must show by a preponderance of the evidence that the proposed transfer will better and more conveniently serve the interests of the parties and witnesses and better promote the interests of justice." *Helsel v. Tishman Realty & Constr. Co., Inc.*, 198 F. Supp. 2d 710, 711 (D. Md. 2002). The Court weighs a number of case-specific factors in making this determination, including: (1) the weight accorded to the plaintiff's choice of forum; (2) witness convenience and access to sources of proof; (3) the convenience of the parties; and (4) the interest of justice. *Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.* ("*Trustees*"), 791 F.3d 436, 444 (4th Cir. 2015). In deciding a motion to transfer, a court may consider materials outside the pleadings. *See Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.3d 633, 645 (2d Cir. 1956) (*forum non conveniens*); *Huang v. Napolitano*, 721 F. Supp. 2d 46, 47 n.2 (D.D.C. 2010); *Citibank, N.A. v. Affinity Processing Corp.*, 248 F. Supp. 2d 172, 176 (E.D.N.Y. 2003). Doe does not dispute that this case could have been brought in the Eastern District of Pennsylvania, and venue is clearly

22

proper in that District because, as discussed above, "a substantial part of the events or omissions giving rise to the claim occurred" at the Quality Inn. 28 U.S.C. § 1391(b)(2). The Court therefore addresses the relevant § 1404 factors.

### A.   Plaintiff's Choice of Forum

Turning to the first factor, the plaintiff's choice of forum, the general rule is that the plaintiff's preference is afforded "substantial weight in determining whether transfer is appropriate." *Trustees*, 791 F.3d at 444. The deference accorded to the plaintiff's choice of forum should be proportional to the relationship between the forum and the cause of action and is lower when the plaintiff is not citizen of the state or the case does not otherwise have "significant ties" to the forum. *See Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237–38 (2d Cir. 2004) (affirming the district court's venue determination based in part on the conclusion that the weight accorded to the plaintiff's choice of forum was "diminished" because the cause of action did not have "significant ties" to that forum); *Bannister v. Wal-Mart Stores East, L.P.*, 843 F. Supp. 2d 610, 615 (E.D.N.C. 2012) (according lesser weight to the choice of forum because the plaintiffs were not residents of the forum state and alleged discrimination at their workplace in a different state).

Although Doe chose to file this case in the District of Maryland, Choice argues that this selection should be accorded little weight because Doe is not a resident of Maryland and her causes of action arise from acts that allegedly occurred entirely in Pennsylvania. While the Court agrees that the primary events underlying this case occurred in Pennsylvania, Doe's claims against Choice specifically involve certain omissions by Choice that likely occurred in Maryland. Other courts have concluded that decisionmaking relevant to a plaintiff's TVPRA claims against a hotel franchisor occurred at the franchisor's headquarters in the forum state. *See, e.g.*, *J.N.K.*, 2025 WL

772150, at *7. While this case therefore has a sufficient connection to the District of Maryland such that this factor technically weighs in the plaintiff's favor, where the trafficking at the center of this litigation took place in Pennsylvania, and where Doe is not a resident of Maryland, the Court finds that this factor is not entitled to substantial weight. *See Bannister*, 843 F. Supp. 2d at 615.

### B.     Witness Convenience

The second factor, witness convenience, is "perhaps the most important factor" in determining whether a transfer of venue should be granted. *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 473 (D. Md. 2008) (quoting *Cronos Containers Ltd. v. Amazon Lines, Ltd.*, 121 F. Supp. 2d 461, 466 (D. Md. 2000)). This factor protects witnesses from unnecessary travel, expenditures of time, and expenses. *See id.* at 474. On this factor, "mere assertions of inconvenience or hardship are inadequate"; rather, movants must detail the specific hardships that witnesses will suffer by proceeding in the plaintiff's chosen venue. *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002).

Choice asserts that virtually all of the relevant witnesses, including Doe's "alleged trafficker, hotel staff, knowledgeable law enforcement personnel, doctors, and other damages witnesses," are likely located in or near the Eastern District of Pennsylvania, where the Quality Inn is located. Choice Mot. at 11, ECF No. 30-1. Where this case cannot be proven without demonstrating both that Doe was trafficked at the Quality Inn, and that Tinicum and its staff knew or should have known of the trafficking based on the facts and circumstances present at the hotel during the trafficking, the Court agrees that the primary witnesses necessarily include individuals who were present in the Eastern District of Pennsylvania at the time of the events in question. Although Doe argues that Choice has not actually identified specific witnesses by name, and that with the passage of time these individuals may no longer reside in the area, Choice's ability to

24

identify specific witnesses and ascertain their present locations was hindered because Doe's identity, and thus the key facts about the trafficking incidents, were not disclosed to Choice at the outset of the case, and it is substantially more likely that these witnesses remain in that area rather than having relocated to Maryland or beyond.

Significantly, the witnesses with knowledge of the trafficking activities would include many non-party witnesses for whom travel to Maryland would likely present an inconvenience. Some also may not be subject to subpoena for depositions or trial in Maryland depending on where they are presently located in Pennsylvania. *See* Fed. R. Civ. P. 45(c)(1) (stating that a subpoena "may command a person to attend a trial, hearing, or deposition only," as relevant here, when the proceeding will occur "within the state," or "within 100 miles of," "where the person resides, is employed, or regularly transacts business in person"). Although Doe notes that Choice personnel, who are relevant to her claims against Choice, are located in Maryland, such witnesses are party witnesses who would likely be available to testify in the Eastern District of Pennsylvania, and as employees of a large corporation, the inconvenience to them of travel would likely be far less than for non-party witnesses asked to travel to Maryland. *See D2L Ltd. v. Blackboard, Inc.*, 671 F. Supp. 2d 768, 782 (D. Md. 2009) ("Inconvenience to party witnesses is given less weight than inconvenience to non-party witnesses because the former are 'presumed to be more willing to testify in a different forum[.]'" (quoting *Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 718 (E.D. Va. 2005))). Accordingly, the Court concludes that the witness convenience factor weighs in favor of transfer.

### C.   Convenience of the Parties

The next factor is whether the convenience of the parties to the litigation counsels in favor of transfer. Here, Choice is located in Maryland, Tinicum is located in Pennsylvania, and Doe is

a resident of Delaware. While Doe's specific city of residence in Delaware has not been provided, it is more likely that the Eastern District of Pennsylvania, with its primary courthouse in Philadelphia, Pennsylvania located in close proximity to Delaware, is a more convenient forum for Doe than the District of Maryland, with the assigned courthouse located in Greenbelt, Maryland, which is significantly further away from the most populated parts of Delaware. The Court thus concludes that this factor favors transfer to a limited degree.

### D.     Interests of Justice

Finally, in addressing the factor of the interests of justice, Choice asserts that this dispute is, at its essence, a local controversy in Pennsylvania that should be decided "at home." Choice Mot. at 12 (quoting *Smart v. MedStar Washington Hosp. Ctr.*, No. 21-2072-TJS, 2022 WL 616827, at *2 (D. Md. Mar. 2, 2022)). Doe responds that Maryland also has "a significant interest in regulating the conduct at issue" because relevant events occurred in both Pennsylvania and Maryland. Opp'n to Choice Mot. at 11, ECF No. 31. Further, Doe asserts that there is a "strong public interest in keeping this litigation in this District because it is [the] only venue that allows for the possibility of centralizing TVPRA cases against Choice." *Id.*

Here, as discussed above, the Court concludes that this case has relatively stronger ties to Pennsylvania, where the sex trafficking actually occurred, than to Maryland. More importantly, the Court finds that its lack of personal jurisdiction over Tinicum, a key party in this litigation, strongly counsels in favor of transferring this case to the Eastern District of Pennsylvania, a proper venue where personal jurisdiction would exist over both Tinicum and Choice. *See, e.g.*, *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 433–34 (N.D. Tex. 2021) (collecting cases concluding that personal jurisdiction exists over out-of-state franchisors in the judicial district where the trafficking took place). Having the claims in this case proceed in two different districts would be

highly inefficient and incompatible with interests of judicial economy. Indeed, other judges in this District have concluded that, under substantially similar facts, the interests of justice favored transfer to the district in which the alleged trafficking took place. *See, e.g.*, *Doe (J.L.K.)*, 2025 WL 2197035, at *7; *Doe (C.T.K.) v. Choice Hotels Int'l, Inc.*, No. 24-2836-DLB, 2025 WL 2430024, at *6 (D. Md. Aug. 22, 2025). The Court therefore concludes that the interests of justice weigh strongly in favor of transferring this case. *See Aphena Pharma Sols.-Maryland LLC v. BioZone Laboratories, Inc.*, 912 F. Supp. 2d 309, 320–21 (D. Md. 2012) (concluding that, where the court held that it did not have personal jurisdiction over one of three defendants, the interests of justice "strongly favor transfer," even where "the other factors are either evenly balanced or favor retaining the case," to advance judicial economy by keeping all defendants in a single case).

In summary, where Doe's choice of forum is not entitled to substantial weight, and the remaining factors all weigh in favor of transfer, the Court will transfer this case to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404. The Court therefore need not and will not address Choice's arguments for dismissal for failure to state a claim under Rule 12(b)(6), which may be reasserted after transfer.

## CONCLUSION

For the foregoing reasons, Tinicum's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART in that the Court finds that it lacks personal jurisdiction over Tinicum but will transfer the claims against it to the United States District Court for the Eastern District of Pennsylvania, and Choice's Motion to Transfer Venue or, in the Alternative, to Dismiss will be GRANTED in that the claims against Choice, and thus the entire case, will be transferred to the Eastern District of Pennsylvania. The Court will not resolve Defendants' arguments for dismissal for failure to state a claim, which may be considered after transfer. A separate Order shall issue.


Date:   August 27, 2025

THEODORE D. CHUANG
United States District Judge